KEYSTONE TANKSHIP CORPORA-
TION, Plaintiff,

v.

KIDD CONSTRUCTION CORPORA-
TION, and Thomas W. Kidd, Jr., Inc.,
Defendants-Third Party Plaintiffs,

v.

FERNANDES & LAKE, INC., Third
Party Defendant-Fourth Party
Plaintiff,

v.

NEW ENGLAND DRILLING & BLAST-
ING CO., INC., Fourth Party
Defendant.

KEYSTONE TANKSHIP CORPORA-
TION, Plaintiff,

v.

FERNANDES & LAKE, INC., Defend-
ant and Third Party Plaintiff,

v.

NEW ENGLAND DRILLING & BLAST-
ING CO., INC., Third Party
Defendant.

Civ. A. Nos. 71-1288-C, 72-1274-C.

United States District Court,
D. Massachusetts.

April 13, 1973.

Frank H. Handy, Jr., Kneeland, Splane & Kydd, Boston, Mass., for Keystone Tankship Corp.

Francis Leone and Paul Frederick of Ficksman & Conley, Boston, Mass., for Kidd Construction Corp. and Thomas W. Kidd, Jr., Inc.

Ephraim F. Horvitz, McGuire & Collias, Fall River, Mass., for Fernandes & Lake, Inc.

Edward R. Langenbach, Langenbach, Pierce & Wilkinson, Boston, Mass., for New England Drilling & Blasting Co., Inc.

## OPINION

CAFFREY, Chief Judge.

The above-captioned third party and fourth party civil actions were consolidated by agreement of counsel for non-jury trial. Jurisdiction of this court is invoked on the basis of 28 U.S.C.A. § 1333. Plaintiff is a Delaware corporation and is the owner of the motor vessel KEYTRADER. Defendants Kidd Construction Corporation and Thomas W. Kidd, Jr., Inc. are both corporations organized under the laws of the State of Rhode Island. Defendant Fernandes & Lake, Inc. is a corporation organized under the laws of the Commonwealth of

Massachusetts, and defendant New England Drilling & Blasting Co., Inc. is a corporation organized under the laws of the Commonwealth of Massachusetts. After trial I find and rule as follows:

Kidd Construction Corporation entered into a contract with the Commonwealth of Massachusetts on January 5, 1970, under the terms of which Kidd was to remove the so-called Slades Ferry Bridge over the Taunton River and to reconstruct the approaches to the bridge. Kidd entered into a subcontract with Fernandes & Lake, Inc., under the terms of which Fernandes & Lake was to do demolition work. Fernandes & Lake entered into a contract with New England Drilling & Blasting Company, under the terms of which New England was to perform the blasting necessary to the demolition of the bridge piers. The contract between the Commonwealth and Kidd Construction Corporation provided:

> "The channel shall be available for navigation at all times and the Contractor shall so conduct his work that free navigation shall not be obstructed. The channel at the location shall be promptly cleared of all obstructions placed therein or caused by the removal of the bridge.

> "The Contractor shall take all necessary precautions to avoid dropping any material from the superstructure into the water or onto any waterborne craft . . . Any material dropped into the bed of the river shall be removed by the contractor at his own expense regardless of the means necessary to remove it."

This quoted language was incorporated into the subcontract between Kidd and Fernandes & Lake.

On July 27, 1970, the M/V KEYTRADER was on a voyage from Houston, Texas, to the Shell Oil Company dock located in Fall River, Massachusetts. The KEYTRADER was a steel-hulled tanker built in 1954. She was approximately 560' long, had a beam of 68', and on July 27, 1970 drew 30'10".

At about 6:00 A.M. on that day, she arrived off Brenton Reef under the command of Captain William M. Taylor. She was boarded there by Captain Ed Davies, a marine pilot from Cumberland, Rhode Island. Captain Davies took the ship to a point near Buoy No. 10 in Mt. Hope Bay, where, at about 8:30 A.M., she was boarded by Captain Sanford M. Lancashire, the harbor pilot. There, she was joined by two tugs, the SAKONNET and the CASTLE HILL, each of which made fast to the KEYTRADER on opposite sides of her bow. The KEYTRADER proceeded up the Taunton River in the direction of the Shell Oil dock. In a period of 30 minutes she proceeded some two miles from the No. 10 Buoy to the vicinity of Slades Ferry Bridge, traveling against an ebbing tide, at approximately 4 knots. The channel near the bridge was 100' in width and the westerly boundary was marked by a black can buoy which was positioned some 75 yards south of the bridge. The starboard (easterly) extremity of the channel was marked by a red nun buoy. The tugs fell astern near the draw of the bridge.

The United States Coast Guard had issued, on June 30, 1970, a local notice to mariners which advised that at mean low water the channel had a depth of 35' for a width of 100' at what was formerly the draw of the Slades Ferry Bridge.

On July 27, 1970, low tide was at about 10:00 A.M. At about 9:04 A.M., while Capt. Lancashire was at the wheel, the KEYTRADER struck a submerged object on her starboard side which caused some hull damage. The evidence at the trial was sharply in conflict as to just what the location of the KEYTRADER was at the time of impact. Witnesses called by the plaintiff testified that the vessel was in the center of the channel. Witnesses called by the defendants testified that there was no obstruction within the channel limits which could have been struck by the KEYTRADER had it been in the channel.

The case reduces itself to the resolving of an issue of credibility, and I find that the last blasting performed at or near the Slades Ferry Bridge prior to July 27, 1970 occurred on July 17, on the west side of the channel. I accept as truthful the testimony of Richard Silveira that he made 15 or 20 sweeps of the channel and the adjacent area from a point 44′ north of the centerline of the bridge to a point 55′ south of the centerline of the bridge. He testified that on none of the sweeps did he find any obstruction in the channel and that he found that the channel at mean low water had a depth of 35′ in the area swept.

More importantly, Mr. Silveira testified and I find that he also swept beyond the east and west limits of the channel and that in the course of those sweeps he found the remains of a rest pier 7.4′ to the east of the easterly channel limit at a depth of 28.8′ below the mean water level. This portion of the pier stood 13.6′ above the river bottom and had a diameter of 8.5′. The evidence at the trial negates the occurrence of any change in the condition of the channel bottom between July 17 and July 27. In the light of this fact, the testimony of Capt. Lancashire is significant. He testified that he had taken tankers of approximately the same dimensions as the KEYTRADER through the bridge site five times in July prior to the 27th. He further testified that he had taken a tanker of the KEYTRADER's size through the same area either three or four days prior to the accident. Thus, his last passage through this channel prior to the accident occurred on either July 23 or July 24. Both dates are well subsequent to the date of the last blasting. The record is bereft of any evidence that an obstruction was removed or that refuse was dredged from the channel between July 17 and Mr. Silveira's sweep which was conducted on August 4. For two reasons I do not accept as factual Capt. Lancashire's testimony that he had the KEYTRADER in the center of the channel: first, because I find that the obstacle struck by the KEYTRADER was not in the channel but was 7.4′ beyond the easterly limit of the channel; and, secondly, because Capt. Lancashire claimed that he was 25′ to 30′ starboard of the red nun buoy. Other evidence in the case indicated that the red nun buoy was properly on station on July 27, 1970. Thus, if Capt. Lancashire is correct in saying that he was 25′ to 30′ to the starboard of the nun buoy, simple addition of the 25 to 30 feet to the 68′ beam of the vessel would put her close, if not at, the westerly limit of the channel, which concededly is only 100′ wide at the location involved herein.

Accordingly, I find and rule that the damage sustained by the KEYTRADER was not the result of her striking any obstacle within the channel limits. I rule that plaintiffs have failed to show any negligent act on the part of any defendant which placed an obstacle within the channel limits, and I further find, contrary to the testimony of personnel aboard the KEYTRADER, that she was not in the channel but, on the contrary, struck the remains of a rest pier located beyond the channel limits.

I rule that plaintiff has failed to prove that a negligent act by any named defendant was the proximate cause of the collision.

Judgment for the defendants.